# Exhibit A

Fulton County Superior Court
***EFILED***ZZ
Date: 2/27/2026 11:58 AM
Che Alexander, Clerk

**IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA**

| | |
|---|---|
| EDWARD HENDERSON, individually and on behalf of all those similarly situated, | CIVIL ACTION |
| Plaintiff, | File No.          26CV003014 |
| v. | |
| COX ENTERPRISES, INC. d/b/a THE ATLANTA JOURNAL-CONSTITUTION, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Edward Henderson ("Plaintiff"), individually and on behalf of all those similarly situated, brings this Class Action against Cox Enterprises, Inc. d/b/a the Atlanta Journal-Constitution ("Defendant") for its violation of the Video Protection Privacy Act, 18 U.S.C. § 2710 ("VPPA") and invasion of privacy. The allegations contained in this complaint are based upon Plaintiff's personal knowledge and investigation of counsel.

## NATURE OF THE ACTION

1.    Cox Enterprises, Inc. ("Cox") is a global corporation that operates in the communications and automotive industries. Cox has over 50,000 employees

1

and brings in $23 billion in annual revenue.[1]

2.      Cox owns the Atlanta Journal-Constitution ("AJC"), a media outlet that reports news from across the southern United States. AJC is Atlanta's longest-running news publication and describes itself as "the substance and soul of the south."[2] After ceasing distribution of its print publication in December 2025, AJC became a fully digital news platform.[3]

3.      AJC puts a majority of its content behind a "paywall" that is only accessible by becoming a subscriber.

4.      Once subscribed, AJC subscribers can access the publication through its website and through its mobile application. Both platforms allow subscribers to access AJC's content and watch pre-recorded videos.

5.      Without asking subscribers for their consent, however, Defendant discloses AJC subscribers' personally identifiable information ("PII") such as video viewing habits to unaffiliated third parties, including Meta Platforms, Inc. ("Meta").

---

[1] *About Us*, COX ENTERPRISES, https://www.coxenterprises.com/about-us (last visited Feb. 27, 2026).

[2] *Who We Are*, ATLANTA J. CONST., https://www.ajc.com/who-we-are/home (last visited Feb. 27, 2026).

[3] Christopher Harris, *The Atlanta Journal-Constitution prints final newspaper, shifts to all-digital format*, CBS NEWS (Dec. 31, 2025, at 9:31 ET), https://www.cbsnews.com/atlanta/news/atlanta-journal-constitution-prints-final-edition-shifts-to-all-digital-format/.

6.     Defendant does this by embedding the Meta Pixel on the AJC website. The Meta Pixel is a hidden piece of JavaScript code that allows website owners (and Meta) to track visitor interactions with their website and measure the effectiveness of their advertising.[4]

7.     The Meta Pixel also allows Meta to link AJC subscribers' viewing habits with their social media profiles through their Facebook IDs, which are unique identifiers assigned to every Facebook account. AJC discloses each subscriber's video viewing history, including video titles, to Meta for the purpose of sending targeted ads, and ultimately for profit.

8.     Defendant is a "video tape service provider," and Plaintiff and the Class are "consumers" as those terms are defined in 18 U.S.C. § 2710(a). Defendant discloses Plaintiff's and the Class's PII to a third party, without their consent, through its use of the Meta Pixel.

9.     Defendant's conduct is a violation of the VPPA and an invasion of privacy. Accordingly, Plaintiff brings the following action on behalf of himself and those similarly situated.

### PARTIES

10.     Plaintiff is a natural person who at all relevant times was a resident of

---

[4] *What is a pixel?* META, https://www.facebook.com/business/tools/meta-pixel/ (last visited Feb. 27, 2026).

the state of Georgia. Plaintiff has been a subscriber to AJC since 2018 and has had

a Facebook account since 2006. Plaintiff is a citizen of Georgia.

11.    Defendant Cox Enterprises, Inc. d/b/a the *Atlanta Journal-Constitution* is a privately held global corporation headquartered in Atlanta, Georgia. Defendant is a citizen of Georgia.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to O.C.G.A. § 15-6-8.

13.    This Court has personal jurisdiction over Defendant because Defendant resides in this County, many of the acts and transactions giving rise to the action occurred in this County, and because Defendant conducts substantial business by operating its principal place of business and soliciting subscribers in this County.

14.    Venue is proper under Ga. Code Ann. § 14-2-510(b)(1) because Defendant maintains a registered office in Fulton County, Georgia. Defendant may be served by serving its registered agent for service of process, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

## FACTUAL BACKGROUND

### I.    Legislative History of the VPPA

15.    The VPPA was enacted in 1988 in response to the publication of

Supreme Court nominee Robert Bork's video rental history by a Washington, D.C.

weekly newspaper.

16.    During the 1987 hearings on Judge Bork's nomination, Senator

Patrick Leahy addressed the incident before the Senate Committee on the Judiciary,

stating:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home . . . . In an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong . . . . I think that really is big brother, and I think it is something that we have to guard against.[5]

17.    Senator Leahy introduced the Video Protection Privacy Act the

following year, stating that "the trail of information generated by every transaction

---

[5] S. Rep. 100-599, at 5–6, *available at* https://epic.org/wp-content/uploads/privacy/vppa/Senate-Report-100-599.pdf (omissions in original).

that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."[6]

18.    Janlori Goldman, then counsel for the American Civil Liberties Union, made a prescient statement to the Senate in support of the act:

> [The right to privacy has] grown increasingly vulnerable with the growth of advanced information technology. The new technologies not only foster more intrusive data collection, but make possible increased demands for personal, sensitive information. *Private commercial interests want personal information to better advertise their products* . . . . The computer makes possible the instant assembly of this information.[7]

19.    The VPPA states that: "A video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person[.]" 18 U.S.C. § 2710(b).

20.    A "video tape service provider" is defined as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" 18 U.S.C. § 2710(a)(4).

---

[6] *Id.* at 7.
[7] *Id.* (emphasis added).

6

21.     "Personally identifiable information" includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C.A. § 2710(a)(3).

22.     A "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1).

23.     The proponents of the VPPA could not have known in 1988 the extent to which individuals' viewing and reading habits would be monetized by 2026. However, they sensed the looming threat to the right to privacy posed by disclosure of the media someone chooses to consume.

24.     While most people no longer rent videos recorded on physical media, recorded video viewership is greater than ever through the internet and mobile apps. The VPPA applies as much to these platforms as it did to VHS rental services in 1988.

25.     Courts across the United States have held that digital media falls within the purview of the VPPA. Digital newsletters from professional sports associations,[8] digital learning platforms,[9] online information repositories with

---

[8] *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 536 (2d Cir. 2024), *cert. denied sub nom. NBA v. Salazar*, No. 24-994, 2025 WL 3506972 (U.S. Dec. 8, 2025).
[9] *Cole v. LinkedIn Corp.*, No. 25-CV-01097-PCP, 2025 WL 2963221, at *4 (N.D. Cal. Oct. 20, 2025).

7

embedded video content,[10] and news outlets offering video content[11] have given rise to valid claims under the VPPA.

## II.     The *Atlanta Journal-Constitution*

26.     Cox Enterprises, Inc. purchased the *Atlanta Journal* in 1939 and the *Atlanta Constitution* in 1950. In 2001, the newspapers were merged into a single publication: the *Atlanta Journal-Constitution*.[12]

27.     In 1998, Defendant launched AJC.com. The website was maintained by AJC's newsroom and became the number one website for news and information in metropolitan Atlanta.[13]

28.     Defendant announced that AJC would become a fully digital publication in August 2025 and distributed the final print version of the newspaper on December 31, 2025. AJC remains accessible on AJC.com and on AJC's mobile application.

29.     Because AJC has most of its content behind a "paywall," consumers must subscribe to AJC before having access to AJC's content:

---

[10] *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1341 (N.D. Ga. 2022).

[11] *Harris v. Pub. Broad. Serv.*, 662 F. Supp. 3d 1327, 1333 (N.D. Ga. 2023) (finding that plaintiff who accessed video content after subscribing to PBS's mobile app could bring a claim under the VPPA).

[12] *AJC History: The story of The Atlanta Journal-Constitution*, ATLANTA J. CONST. (2019), *available at* https://web.archive.org/web/20190401125441/ https://www.ajc.com/about/ajc-history/.

[13] *Id.*

8



30.    Subscribers to the print version of AJC were required to switch to a digital-only subscription before January 1, 2026.[14]

31.    As of August 2025, AJC had 115,000 paying subscribers.[15]

## III.    Facebook and the Meta Pixel

32.    Facebook, Meta's main social media platform, has over 3 billion active users.[16]

33.    Facebook describes itself as "a community where everyone uses the name they use in everyday life. This makes it so that you always know who you're connecting with."[17]

---

[14] *Supra* note 3.

[15] Veronica Villafaña, *Atlanta Journal-Constitution to end print run, go fully digital*, MEDIA MOVES (Aug. 29, 2025), https://www.mediamoves.com/2025/08/atlanta-journal-constitution-to-end-print-run-go-fully-digital.html.

[16] *Most used social networks 2025, by number of users*, STATISTA (Nov. 19, 2025), https://www.statista.com/statistics/272014/global-social-networks-ranked-by-number-of-users/.

[17] *Names allowed on Facebook*, META, https://www.facebook.com/help/229715077154790 (last visited Feb. 24, 2026).

34.    Indeed, when users sign up for Facebook, Facebook Community Standards require that individuals use their real identities to create an account by providing their first and last name, date of birth, and gender.

35.    Upon creating a Facebook account, Facebook assigns a unique Facebook ID to that user.

36.    If someone were to obtain the users Facebook ID, they could search Facebook using that Facebook ID to reveal the identity of the associated user.

37.    Moreover, when Facebook users sign in to Facebook, Facebook places a "c_user" cookie on their browser, which helps identify the individual and tracks them across multiple websites that they visit (even outside of Facebook).

38.    The "c_user" cookie works in tandem with the Facebook ID in that whenever a user logs in across different browsers or devices, the new "c_user" cookie on that browser or device will link with the unique Facebook ID, and allow Facebook to track you cross-browser and cross-device, creating a more comprehensive profile of each individual Facebook user.

39.    Facebook implements these tools for the purpose of generating profit.

40.    For many years, Meta has generated hundreds of billions of dollars in advertising revenue by allowing companies to place ads on Facebook.[18]

_____

[18] *Annual advertising revenue of Meta Platforms worldwide from 2009 to 2024*, STATISTA (Nov. 25, 2025), https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/.

41.    To increase its advertising revenue, Meta offers tracking and analytics services, including the Meta Pixel, to third parties.

42.    The Meta Pixel is a type of tracking code developed by Meta Platforms, Inc. The Meta Pixel monitors the behavior of people visiting websites running the Meta Pixel code.

43.    As Meta describes it: "The Meta Pixel is a snippet of JavaScript code that loads a small library of functions you can use to track Facebook ad-driven visitor activity on your website. It relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns." [19]

44.    The Meta Pixel allows website operators to track the behavior of users of their website: "It works by sharing data about user actions on your website — from page views to purchases — and sends this information to Meta to improve ad delivery and measurement." [20]

---

[19] *Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Feb. 27, 2026).
[20] *Supra* note 4.

45.     The Meta Pixel collects large swaths of information relating to a website users' IP addresses, unique ID numbers, webpages visited, buttons clicked, keystrokes typed, videos watched, and more.

46.     Defendant installed Meta Pixel on AJC's website.

47.     When subscribers visit AJC's platform and view videos, their unique Facebook ID and the video they viewed is sent to Meta through the Meta Pixel.

48.     Meta—and any third party with access to this information, for that matter—can easily determine which Facebook user has viewed a particular page or video. As Meta has stated, Facebook profiles identify people as they are in "everyday life."

## IV.    Website Users Have a Reasonable Expectation of Privacy in their Interactions with Defendant's Platform

49.     Consumers are skeptical and wary about their data being collected. A 2021 report released by KPMG showed that a full 86% of the respondents said they feel a growing concern about data privacy, while 68% expressed fears about the amount of data being collected by businesses. 30% of respondents stated there are no circumstances under which they would be willing to share their personal data with businesses.[21]

---

[21] *Corporate data responsibility: Bridging the consumer trust gap*, KPMG (Aug. 2021), https://kpmg.com/kpmg-us/content/dam/kpmg/pdf/2023/corporate-data-responsibility-bridging-the-consumer-trust-gap.pdf.

50.    Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website hosts and not be shared with a third-party they know nothing about.[22] As such, website visitors reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[23]

51.    Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

52.    A 2017 study by Consumer Reports showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[24]

---

[22] *CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/newsreleases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towardsprivacy-and-online-tracking-301064970.html.

[23] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, 38:4 THE INFO. SOC'Y 257, 258 (2022).

[24] *Government & Consumer Issues Survey*, CONSUMER REP. (May 2017), https://innovation.consumerreports.org/wp-content/uploads/2023/02/Consumer-Reports-Government-and-Consumer-Issues-Survey-May-2017-Digital-Lab.pdf

53.    Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[25]

## V.    Website User and Usage Data Have Immense Economic Value

54.    The "world's most valuable resource is no longer oil, but data."[26]

55.    In 2022, Business News Daily reported that some businesses collect personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.* customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers.[27] This information is valuable to companies because they can use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[28]

---

[25] Margaret Taylor, *How Apple screwed Facebook*, WIRED (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.
[26] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.
[27] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUS. NEWS DAILY (Aug. 25, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.
[28] *Id*.

56.     In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[29]

57.     In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[30] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses." [31]

58.     OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [*i.e.,* $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record.

---

[29] Brad Brown et al., *Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[30] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, 220 OECD DIGIT. ECON. PAPERS (Apr. 2, 2013), https://www.oecd.org/content/dam/oecd/en/publications/reports/2013/04/exploring-the-economics-of-personal-data_g17a228d/5k486qtxldmq-en.pdf.

[31] *Id.* at 25.

A combination of address, date of birth, social security number, credit record and military are estimated to cost USD 55."[32]

## VI.    Plaintiff's Experience

59.    Plaintiff is a resident of the state of Georgia.

60.    Plaintiff has been a paid digital subscriber to AJC since 2018. He pays a subscription fee of $9.99 per month for full access to the publication.

61.    Plaintiff has maintained a Facebook account since 2006.

62.    Since subscribing to AJC, Plaintiff has accessed AJC's website daily. He views articles and videos on politics and sports, particularly when college sports are in season.

63.    Plaintiff did not consent to Defendant disclosing his PII to any third party.

## CLASS ALLEGATIONS

64.    Plaintiff seeks to represent the following Class of similarly situated individuals:

> All persons in the United States with a digital subscription to *Atlanta Journal-Constitution* that had their PII disclosed to Facebook by Defendant (the "Class").

65.    Specifically excluded from the Class is Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts,

---

[32] *Id*.

16

representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and its heir, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers.

66.    Plaintiff reserves the right to modify or amend the definition of the proposed Class if necessary before this Court determines whether certification is appropriate.

67.    This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of O.C.G.A. § 9-11-23(a) and (b)(3) and other statutes and case law regarding class action litigation in the State of Georgia.

68.    **Numerosity:** The Class is so numerous that joinder of all members is impractical. As stated above, AJC is reported to have 115,000 paid subscribers. Additionally, although Plaintiff is unaware of the exact number, Defendant has many unpaid subscribers. The total number of paid and unpaid AJC subscribers whose PII was disclosed through the Meta Pixel can be determined from Defendant's, or Meta's, records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or publication notice.

17

69.     **Commonality and Predominance:** Several questions of law and fact are common to Plaintiff and the proposed Class, and these questions predominate over issues affecting individual Class members. Such questions include:

a.     Whether Defendant disclosed subscribers' PII history to third parties;

b.     Whether Defendant's conduct was without subscribers consent;

c.     Whether Defendant's conduct was an invasion of privacy; and

d.     Whether Plaintiffs and the Class are entitled to damages.

70.     **Typicality:** Plaintiff's claim is typical of the claims of the Class. Plaintiff's and the Class's claims arise from the same conduct by the Defendant, namely, disclosing its subscribers' PII to Meta through the Meta Pixel. Plaintiff's and the Class's claims are brought under the same legal theory that this conduct violates the VPPA and constitutes an invasion of privacy.

71.     **Adequacy of Representation:** Plaintiff has no interests antagonistic to those of the proposed class. Class members will benefit from the filing of this Complaint as if they had filed it themselves. Furthermore, Plaintiff is represented by counsel who has extensive experience in consumer class action lawsuits and who will diligently prosecute the claims of Plaintiff and the Class members.

72.     **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this litigation and no unusual difficulties are likely to be encountered in the management of this class action. The damages or

18

financial detriment suffered by individual Class members are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE VIDEO PROTECTION PRIVACY ACT,**
**18 U.S.C. §§ 2710, *et seq.* ("VPPA")**
**(On Behalf of Plaintiff and the Class)**

73.    Plaintiff incorporates the preceding factual allegations as if fully set forth herein.

74.    Plaintiff brings this claim individually and on behalf of the proposed Class.

75.    Defendant is a "video tape service provider" as that term is defined in 18 U.S.C. § 2710(a)(4) because Defendant is engaged in the business of selling and

19

delivering prerecorded video materials, *i.e.*, the video content included on AJC's website, much of which requires a subscription to access.

76.    Plaintiff and the Class are "consumers" as defined in 18 U.S.C. § 2710(a)(1) because they are purchasers of, and/or subscribers to, the services of Defendant.

77.    Plaintiff and the Class paid for, or otherwise subscribed to Defendant in exchange for, access to AJC content, which includes prerecorded videos.

78.    Defendant installed the Meta Pixel on its website. The Meta Pixel identified Plaintiff and the Class through unique Facebook IDs and captured their viewing habits and videos that they viewed on AJC's website.

79.    Defendant knowingly discloses the PII of its consumers to a third party, Meta, through the Meta Pixel, in violation of 18 U.S.C. § 2710(b), including unique Facebook IDs and a record of which videos Plaintiff and the Class view.

80.    Defendant's disclosure is without the consent of Plaintiff and members of the Class.

81.    Defendant's use of the Meta Pixel does not fall under any of the exceptions to those contained in 18 U.S.C. § 2710(b)(2).

82.    Defendant's conduct violates the VPPA, and Defendant is liable to Plaintiff and the Class.

20

## SECOND CAUSE OF ACTION
## INVASION OF PRIVACY – INTRUSION UPON SECLUSION
### (On Behalf of Plaintiff and the Class)

83.    Plaintiff incorporates the preceding factual allegations as if fully set forth herein.

84.    Plaintiff brings this claim individually and on behalf of the Class.

85.    Plaintiff and Class Members have an objective, reasonable expectation of privacy in their viewing habits.

86.    Plaintiff and Class Members did not consent to, authorize, or know about Defendant's intrusion at the time it occurred. Plaintiff and Class Members never agreed that Meta could collect, or that AJC could disclose, their video viewing history.

87.    Plaintiff and Class Members had an objective interest in precluding the dissemination and/or misuse of their information and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

88.    Defendant intentionally intrudes on Plaintiff's and Class Members' private life, seclusion, or solitude, without consent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Edward Henderson, on behalf of himself and the Class, respectfully requests:

21

a) An order certifying the Class under O.C.G.A. § 9-11-23 and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b) An order finding in favor of Plaintiff and the Class on all counts asserted herein;

c) Damages in an amount to be determined by the trier of fact;

d) An order awarding expenses of litigation, including reasonable attorneys' fees, costs, and expenses;

e) An order awarding pre- and post-judgment interest on any amounts awarded; and

f) An order awarding such other and further relief as may be just and proper, including injunctive relief and declaratory relief.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable.

Dated: February 27, 2026

Respectfully submitted,

*/s/ Nicholas A. Colella*
Nicholas A. Colella (GA Bar No. 299972)
Anasuya Shekhar*
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, Pennsylvania 15222
Telephone: (412) 322-9243
Facsimile: (4120 231-0246
nickc@lcllp.com

22

23

anasuya@lcllp.com

*pro hac vice* application forthcoming

# Exhibit B

Fulton County Superior Court
***EFILED***ZZ
Date: 2/27/2026 11:58 AM
Che Alexander, Clerk

**IN THE SUPERIOR COURT OF** Fulton **COUNTY**

**STATE OF GEORGIA**

Edward Henderson

**Plaintiff**

**v.**

Cox Enterprises, Inc. d/b/a the Atlanta Journal-Constitution

**Defendant**

Civil Action No. 26CV003014

## SUMMONS

TO THE ABOVE NAMED DEFENDANT:

You are hereby required to file with the Clerk of said Court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

Nicholas A. Colella

Lynch Carpenter, LLP, 1133 Penn Ave., Fl. 5, Pittsburgh, PA 15222

T: (412) 322-9243

nickc@lcllp.com

an answer to the complaint which is hereby served on you.  You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

This _____ 02/27/2026 day of _____, 20___.

[Clerk's Name]
Clerk of Superior Court

By _____
Deputy Clerk

[Attach addendum sheet for additional parties, if needed.  You must make a notation on this sheet if used.]

SC-1
Rev'd 1/25

# Exhibit C

Fulton County Superior Court
***EFILED***MH
Date: 3/31/2026 10:05 AM
Che Alexander, Clerk

**IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA**

EDWARD HENDERSON, individually and on behalf of all those similarly situated,

      Plaintiff,

v.

COX ENTERPRISES, INC. d/b/a THE ATLANTA JOURNAL-CONSTITUTION,

      Defendant.

CIVIL ACTION

File No. 26CV003014

**WAIVER OF SERVICE OF SUMMONS**

To: Nicholas A. Colella
    Lynch Carpenter, LLP
    1133 Penn Avenue, 5th Floor
    Pittsburgh, PA 15222

      I acknowledge receipt of your request that I waive service of a summons in the action of *Henderson v. Cox Enterprises, Inc. d/b/a The Atlanta Journal-Constitution*, which is case number 26CV003014 in the Superior Court of the State of Georgia in and for the County of Fulton. I have also received a copy of the complaint in the action, two copies of this instrument, and a means by which I can return the signed waiver to you without cost to me. I understand that I am entitled to consult with my own attorney regarding the consequences of my signing this waiver.

      I agree to save the cost of service of a summons and an additional copy of the complaint in this lawsuit by not requiring that I (or the entity on whose behalf I am acting) be served with judicial process in the manner provided by the Georgia Rules of Civil Procedure.

1

I (or the entity on whose behalf I am acting) will retain all defenses or objections to the lawsuit or to the jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against me (or the entity on whose behalf I am acting) if an answer is not served upon you within 60 days after the date this waiver was sent, or within 90 days after that date if the request for the waiver was sent outside the United States.

This 30th day of March, 2026.

  /s/ Ali Abugheida

Ali Abugheida, Esq.
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669

*Attorney for Defendant Cox Enterprises, Inc. d/b/a The Atlanta Journal-Constitution*

2

# Exhibit D

Fulton County Superior Court
***EFILED***MH
Date: 3/24/2026 3:09 PM
Che Alexander, Clerk

# IN THE SUPERIOR COURT OF FULTON

# STATE OF GEORGIA

|  |  |
|---|---|
| Edward Henderson, | **Civil Action No. 26CV003014**<br>**The Honorable Belinda E. Edwards** |
| **Plaintiff(s)** | |
| **vs.** | |
| Cox Enterprises, Inc. d/b/a The Atlanta Journel-Constitution, | |
| **Defendant(s).** | |

## VERIFIED APPLICATION FOR *PRO HAC VICE* ADMISSION

Pursuant to Georgia Uniform Superior Court Rule 4.4, I, Ms. Anasuya E. Shekhar  (Applicant), hereby applies to this Honorable Court for admission to practice in the above-styled case *pro hac vice*. In support of this application, Applicant states as follows:

1. I reside at:

5613 Howe Street
Pittsburgh, PA 15232

2. My business address is:

Lynch Carpenter, LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Phone: (412) 322-9243
Fax: (412) 231-0246
anasuya@lcllp.com

3. I have been retained to represent the following client(s)/plaintiff(s):

Edward Henderson
74 Jaguar Lane, Apt. C-4
Clayton, GA 305255

4. I am a member in good standing of the following jurisdictions:

Court and/or Jurisdiction: Supreme Court of Pennsylvania
Contact information: 717-787-6181
Date admitted: 9/1/2023
Current Status:  Active
Bar/Registration No.: 333531

Jurisdiction: Supreme Court of Indiana
Date admitted: 1/5/2019

Still admitted: Yes
Current Status: ActiveBar/Registration No.: 35360-53

Jurisdiction: Arizona Supreme Court
Date admitted: 2/22/2022
Still admitted: Yes
Current Status: ActiveBar/Registration No.: 037403

Jurisdiction: United States District Court for the Northern District of Indiana
Date admitted: 6/4/2020
Still admitted: Yes
Current Status: ActiveBar/Registration No.:

Jurisdiction: United States District Court for the Southern District of Indiana
Date admitted: 6/11/2020
Still admitted: Yes
Current Status: ActiveBar/Registration No.:

Jurisdiction: United States District Court for the Eastern District of Pennsylvania
Date admitted: 10/29/2024
Still admitted: Yes
Current Status: ActiveBar/Registration No.:

Jurisdiction: United States District Court for the Middle District of Pennsylvania
Date admitted: 6/6/2025
Still admitted: Yes
Current Status: ActiveBar/Registration No.:

Jurisdiction: United States District Court for the Western District of Pennsylvania
Date admitted: 3/6/2025
Still admitted: Yes
Current Status: ActiveBar/Registration No.:

Jurisdiction: United States District Court for the District of Arizona
Date admitted: 6/18/2025
Still admitted: Yes
Current Status: ActiveBar/Registration No.:

5.     I have never been a member of the State Bar of Georgia.

6.     I have never been denied *pro hac vice* admission in Georgia.

7.     I have never had *pro hac vice* admission revoked in Georgia.

8.     I have never been sanctioned or formally disciplined by a court in Georgia.

9.     I have never been the subject of any formal disciplinary proceedings.

10.     I have never been formally held in contempt, or otherwise sanctioned by a court in a written order, for disobedience to its rules or orders.

11.     In the past two years I have not filed for *pro hac vice* admission in Georgia.

12.     I have reviewed and am familiar with the Georgia Rules of Professional Conduct and all court rules relevant to practice before the court in which I am seeking admission.

13.     My local sponsor is:

Nicholas A. Colella
Bar Number: 299972

Lynch Carpenter, LLP
1133 Penn Avenue
5th Floor
Pittsburgh, PA 15222
412-322-9243

14.    When I file my application I will forward a copy to the State Bar of Georgia along with a check or money order made payable to the State Bar of Georgia in the amount of $275, as I have not submitted the annual fee for this calendar year.

I, Anasuya E. Shekhar, applicant in the foregoing Verified Application for *Pro Hac Vice* Admission, hereby verify the facts contained therein are true and accurate to the best of my knowledge.

This ___24th___ day of ___March___, 20_26_

_____
                                                    **Applicant**

Sworn to before me this ___24th___ day of ___March___, 20_26_

_____
                                              **Notary Public**
My commission expires ___Aug. 19, 2028___

Commonwealth of Pennsylvania - Notary Seal
Elaine M. McFarland, Notary Public
Lawrence County
My commission expires August 19, 2028
Commission number 1044978
Member, Pennsylvania Association of Notaries

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served opposing counsel listed below and the Office of the General Counsel with a true and complete copy of the foregoing Verified Application for Pro Hac Vice Admission by U.S. Mail with adequate postage thereon to:

Cox Enterprises, Inc
6205-A Peachtree Dunwoody Road
Atlanta, GA 30328

I am initiating this litigation and do not know who opposing counsel(s) is at this time. I will serve copy of the foregoing Verified Application for Pro Hac Vice Admission on opposing counsel as soon as possible and will notify the Office of the General Counsel of the same.

Filed on this ___24th___ of ___March___, 2026

_____
**Nicholas A. Colella**
**299972**



### Supreme Court of Pennsylvania

## CERTIFICATE OF GOOD STANDING

### Anasuya Elisa Shekhar, Esq.

#### DATE OF ADMISSION

#### September 1, 2023

The above named attorney was duly admitted to the bar of the Commonwealth of Pennsylvania, and is now a qualified member in good standing.

**Witness my hand and official seal**
**Dated:  March 19, 2026**

Nicole Traini
Chief Clerk

# Exhibit E

## Case Information

26CV003014 | Edward Henderson VS. Cox Enterprises, Inc. d/b/a the Atlanta Journal-Constitution

| | | |
|---|---|---|
| Case Number | Court | Judicial Officer |
| 26CV003014 | EJ6 | EDWARDS, BELINDA E. |
| File Date | Case Type | Case Status |
| 02/27/2026 | OTHER CIVIL CAUSE OF ACTION | Open |

## Party

PLAINTIFF
Henderson, Edward

Active Attorneys▼
Lead Attorney
COLELLA, NICHOLAS A.
Retained

DEFENDANT
Cox Enterprises, Inc. d/b/a the Atlanta Journal-Constitution

## Events and Hearings

02/27/2026 PLAINTIFF'S ORIGINAL PETITION ▼

ENVELOPE #20959425 DOC001

Comment
ENVELOPE #20959425 DOC001

02/27/2026 SUMMONS ▾

SUMMONS

Comment
SERVICE UPON DEFENDANT

03/24/2026 APPLICATION FOR PRO HAC VICE ▾

APPLICATION FOR PRO HAC VICE

Comment
Verified Application for Pro Hac Vice Admission

03/31/2026 WAIVER OF SERVICE ▾

WAIVER OF SERVICE

Comment
Waiver of Service of Summons

## Financial

Henderson, Edward

| | | | | |
|---|---|---|---|---|
| Total Financial Assessment | | | | $218.00 |
| Total Payments and Credits | | | | $218.00 |
| 3/1/2026 | Transaction Assessment | | | $218.00 |
| 3/1/2026 | Efile GA Electronic Payment | Receipt # 2026-431652 | Henderson, Edward | ($218.00) |

## Documents

ENVELOPE #20959425 DOC001

SUMMONS

APPLICATION FOR PRO HAC VICE

WAIVER OF SERVICE