**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| EDWARD HENDERSON, individually and on behalf of all those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COX ENTERPRISES, INC. d/b/a THE ATLANTA JOURNAL-CONSTITUTION,<br><br>Defendant. | Civil Action No. 1:26-cv-02295-TWT |

**DEFENDANT COX ENTERPRISES, INC.'S CORRECTED REPLY IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND STAY CASE**

## I. INTRODUCTION

Plaintiff tries to wriggle out of his agreement to AJC's Terms of Use, including their mandatory arbitration clause, by invoking illusory legal rules. He suggests that AJC had to secure his sign-in wrap agreement to the arbitration clause in particular, and not just the Terms of Use as a whole. He complains that the arbitration clause was located "several pages" into the Terms of Use. And he characterizes AJC's registration page as "cluttered" merely because it contained more than one paragraph of subscription-related disclosures and required a few lines of scrolling. But Plaintiff cannot cite a single decision applying any of those legal standards. That's because

they do not exist. The actual test is whether Plaintiff was on notice, given the nature of the transaction and AJC's disclosures, that by subscribing he would accept the Terms of Use. The record leaves no doubt that he was.

Perhaps recognizing as much, Plaintiff attacks AJC's arbitration clause in a different way—by noting that it has not yet been reviewed and registered by the American Arbitration Association ("AAA"), then contending this Court may not compel arbitration because the AAA will surely refuse to arbitrate as a result. That is wrong. The AAA's rules provide that "[i]f a business does not submit its arbitration agreement for review prior to an arbitration being filed under that clause, the AAA will conduct an expedited review for the specific arbitration case," charging "a one-time, nonrefundable expedited review fee." AAA Cons. Arb. R. 12(f). So there is no basis to speculate that the AAA would refuse to arbitrate. Indeed, one of Plaintiff's lead citations, *Bedgood v. Wyndham Vacation Resorts, Inc.*, 88 F.4th 1355 (11th Cir. 2023), rejected ***exactly*** this sort of speculative argument. The Eleventh Circuit has instead declined to compel arbitration only where the AAA has ***already declined*** jurisdiction because of case-specific procedural problems—circumstances entirely different from those presented here. *See id.* at 1359; *Merritt Island Woodwerx, LLC v. Space Coast Credit Union*, 137 F.4th 1268, 1271 (11th Cir. 2025).

Because Plaintiff accepted and is bound by AJC's mandatory arbitration clause, the Court should compel arbitration and stay this litigation.

## II. ARGUMENT AND CITATION OF AUTHORITY

### A. Plaintiff Accepted, And Is Bound By, AJC's Mandatory Arbitration Provision

AJC's Motion established that Plaintiff accepted AJC's Terms of Use under well-established principles of "sign-in wrap" contract formation. Mot. 11-15. Plaintiff leaves nearly all of that explanation unrebutted. He does not dispute that sign-in wrap is an enforceable form of online contractual assent. Mot. 11-12 (citing *Hawkins v. CMG Media Corp.*, 2024 WL 559591, at *3 (N.D. Ga. Feb. 12, 2024)). Nor does Plaintiff contest that enforcing sign-in wrap is particularly appropriate where, as here, a consumer enters "a continuing, forward-looking relationship that would be governed by terms and conditions," which puts the consumer "on notice for a link to the terms of that continuing relationship." Mot. 12-13 (quoting *Singh v. Adobe Inc.*, 797 F. Supp. 3d 1038, 1049 (N.D. Cal. 2025), and *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023)). Plaintiff never disputes that his monthly subscription to AJC is a textbook example of such a forward-looking transaction, or that the sign-in wrap disclosure on AJC's registration screen—"By subscribing, you are agreeing to our Terms of Use, Subscription Terms, and Privacy Policy"—tracks the prototypical language from *Hawkins* essentially verbatim in clear, high-contrast font. Mot. 14-15.

Unable to rebut those grounds for contractual enforcement, Plaintiff falls back on arguments that defy the governing standard for sign-in wrap formation. He first

faults AJC for securing his agreement to the Terms of Use as a whole without expressly singling out the arbitration clause in particular on the registration screen. In Plaintiff's telling, AJC was obligated to "state" on that screen "that by subscribing to Defendant's content, Plaintiff is purportedly agreeing to be bound by arbitration and waiving his rights to a typical trial by judge and jury." Opp. 7. But there is no such requirement. A party need not call out each distinct clause within its governing terms in order to enforce them. Rather, when a party hyperlinks its full terms, ***all*** of those "hyperlinked terms and conditions appearing on registration pages are generally enforceable 'if a reasonable [person] would know that more information would be found if he clicked upon the hyperlink.'" Mot. 12 (quoting *Hanson v. Experian Info. Sols., Inc.*, 2024 WL 3509482, at *9 (N.D. Ga. July 22, 2024)). That is why courts have repeatedly enforced arbitration clauses where consumers agreed, through sign-in wrap, to the broader contracts containing those clauses. *See, e.g.*, *Hanson*, 2024 WL 3509482, at *11 (consumer's agreement to hyperlinked "Terms of Use Agreement" meant embedded arbitration clause was enforceable); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 80 (2d Cir. 2017) (same for consumer's agreement to hyperlinked "Terms of Use"). Plaintiff does not cite a single case to the contrary.

Plaintiff then suggests that the Terms of Use did not adequately disclose the arbitration clause because that clause "is buried several pages deep in the document." Opp. 7. Again, there is no such rule. Contracts typically run several pages, and the

clauses on the later pages—including those related to arbitration—are no less enforceable than those on the first. *See, e.g.*, *In re Checking Acct. Overdraft Litig. MDL No. 2036*, 672 F.3d 1224, 1229 (11th Cir. 2012) (enforcing arbitration clause "located on pages 21 through 23" of governing agreement); *Hanson*, 2024 WL 3509482, at *3, 11 (enforcing arbitration clause on fifth page of Terms of Use); *Meyer*, 868 F.3d at 72, 80 (enforcing arbitration clause on eighth page of Terms of Use). That is particularly true where a "reference" to arbitration in the contract's "first two pages" makes the existence of the subsequent arbitration clause "apparent" from the get-go. *In re Checking Acct.*, 672 F.3d at 1229. Here, the Terms of Use take precisely that approach, advising Plaintiff on the ***first page*** that the agreement would "require" him "to settle certain disputes through individual arbitration, subject to a limited ability to opt out of mandatory arbitration." McGhee Decl. Ex. B, at 1. Plaintiff's only response is a self-serving characterization that the first-page reference was "fleeting," a concept with no legal significance at all. Opp. 7.

Plaintiff next argues that the registration screen was not "uncluttered"—and in fact was so cluttered as to preclude a sign-in wrap agreement—because the disclosure that Plaintiff was agreeing to the Terms of Use was one of "several paragraphs" of text below the button used to select a monthly subscription. Opp. 8. Once more, that is not the legal standard. *Hanson* rejected precisely this type of argument, explaining that a contractual disclosure may be "relatively uncluttered … even though there were

a total of four paragraphs of disclosures" on the page. 2024 WL 3509482, at *11 (citing *Cimillo v. Experian Info. Sols., Inc.*, 2023 WL 2473403, at *5 (S.D.N.Y. Mar. 13, 2023)). What matters, *Hanson* emphasized, is that the disclosure regarding contractual assent is "set off from other paragraphs" rather than buried in a single undifferentiated mass of text. *Id.* AJC's disclosure was set off in precisely that way, alongside a few short additional paragraphs that also disclosed subscription-related information. Mot. 4. Critically, the page was uncluttered by any other content with the potential to distract from Plaintiff's subscription and the attendant disclosures—say, "large, colorful buttons" that "were entirely unrelated to the transaction at hand." *Domer v. Menard, Inc.*, 116 F.4th 686, 699 (7th Cir. 2024) (quotation marks omitted).

Plaintiff also contends that AJC's disclosure of governing contractual terms was inadequate because Plaintiff "could have selected and proceeded with his subscription without ever needing to scroll down completely to see the hyperlink." Opp. 8. That argument fails for at least two reasons.

First, Plaintiff was required to scroll just a handful of lines to view the complete contractual disclosure. *See* Mot. 4. And the need to scroll was clear: The registration screen's subscription-related disclosures initially ended on the top half of a faded sentence fragment. *Id.* Just like "a visible scroll bar," that visual cue alerted Plaintiff to scroll for the remaining text. *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 643 (S.D.N.Y. 2020).

Plaintiff cites no decision (and there is none) holding that the need for such minimal, intuitive scrolling on a smartphone precludes a valid sign-in wrap agreement. Just the opposite—courts have sensibly ruled that disclosures may be adequate where the user "does not need to scroll ***far***" to find them. *Domer*, 116 F.4th at 698 (emphasis added). As a subscriber to an ongoing service with recurring payments, Plaintiff was "on notice for a link to the terms of that continuing relationship." Mot. 13 (quoting *Oberstein*, 60 F.4th at 517). That means Plaintiff should have taken reasonable efforts to locate the relevant link. Scrolling a handful of lines on a smartphone to finish reading visibly cut-off disclosures is hardly unreasonable. This is why courts have rejected the proposition that "the need to scroll automatically works against a finding of reasonably conspicuous notice." *Baugus v. Event Tickets Ctr., Inc.*, 2026 WL 866840, at *15 (S.D.N.Y. Mar. 30, 2026). Scrolling becomes problematic only where users must scroll ***so far*** to find hyperlinked terms that the terms are effectively "buried at the bottom of a webpage or tucked away in obscure corners of the website where users are unlikely to see it," *id.*, as where "the purchaser had to scroll through multiple pages of products before locating the hyperlink at the bottom of a final webpage." *MetroPCS Commc'ns, Inc. v. Porter,* 273 So. 3d 1025, 1028 (Fla. Dist. Ct. App. 2018). AJC's registration page was nothing like that.

Second, Plaintiff has submitted no evidence whatsoever that he did not, in fact,

scroll and view the full contractual disclosure on AJC's registration page. So there is no factual dispute on that point in any event. As Plaintiff recognizes, "[a] summary judgment standard applies to the Court's determination as to whether the parties entered into an arbitration agreement." Opp. 3. AJC has made a prima facie showing that Plaintiff saw the registration page's full contractual disclosure: AJC's evidence shows that (1) the forward-looking nature of the transaction put Plaintiff on the lookout for governing terms, (2) the subscription-related disclosures on the registration page were visibly cut off at the bottom, and (3) the remaining terms, including all contractual disclosures, were easily accessible a few lines further down with the swipe of a thumb. Plaintiff has submitted no countervailing evidence. In particular, he has not asserted through a sworn declaration that he did not see the full contractual disclosure on AJC's registration page. Applying the summary-judgment standard to that record, there is no dispute of fact as to whether Plaintiff saw the disclosure. *See infra* pp. 10-11 (citing cases establishing that a plaintiff must introduce actual evidence to create a dispute of fact).

Plaintiff thus gets nowhere by citing *Thornton* for the proposition that he "cannot have assented to [defendant]'s terms and conditions if he never had the opportunity to see them." Opp. 8 (quoting *Thornton v. Uber Techs., Inc.*, 858 S.E.2d 255, 259 (Ga. Ct. App. 2021)). Plaintiff undisputedly ***did*** have the opportunity to review AJC's Terms of Use, and he does not assert that he failed to see them.

*Thornton* addressed an entirely different set of facts concerning Uber's registration screen. The plaintiff there "presented evidence that a user on a smartphone with an Android operating system experienced an on-screen keyboard appearing at the bottom of the screen" that would, in certain circumstances, have entirely "concealed the text and hyperlink informing the user of Uber's terms and conditions," leaving the user no opportunity to find the hyperlink. 858 S.E.2d at 259. *Thornton* ruled that evidence created a material dispute of fact as to whether the registration screen had in fact disclosed the hyperlink, which it left to the trial court to resolve in the first instance. *Id.* But there is no such dispute here, where Plaintiff has submitted no evidence contesting that he could navigate to AJC's hyperlink for the Terms of Use.

Relatedly, Plaintiff has not created "an issue of material fact ... as to how Defendant's Terms of Use were presented to Plaintiff." Opp. 6. AJC submitted comprehensive evidence on that front: an unrebutted sworn declaration depicting the exact registration process that existed at the time Plaintiff subscribed. McGhee Decl. ¶¶ 8-11. Plaintiff submitted no countervailing evidence whatsoever. Instead, he mischaracterizes and impugns AJC's evidence as "speak[ing] in generalities" and consisting of "bare inferences." Opp. 6. Plaintiff's complaint appears to be that AJC reproduced the screens he saw after the fact instead of somehow capturing his actual experience in real time. But that is neither here nor there. The McGhee Declaration depicts the actual registration flow that existed on the dates that Plaintiff subscribed,

and courts routinely grant motions to compel arbitration on precisely this record. *Hanson*, for example, credited—and compelled arbitration based on—the defendant's declaration containing "the webform 'as it would have appeared' when Plaintiff enrolled" and "the Terms of Use Agreement … in effect when Hanson enrolled." 2024 WL 3509482, at *1; *compare* McGhee Decl. ¶¶ 8-11 (providing "depictions" of the registration screen "Plaintiff would have seen" when he "subscribed"), *with* Decl. of Dan Smith, *Hanson v. Experian Info. Sols., Inc.*, Doc. No. 9-1, ¶ 3 (N.D. Ga. Dec. 18, 2023) (providing "the webform as it would have appeared when Plaintiff enrolled").

Plaintiff mistakenly suggests that *Bazemore* shows that AJC's comprehensive evidence of Plaintiff's screen flow amounts to nothing more than a "scintilla." Opp. 6 (quoting *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1334 (11th Cir. 2016)). Of course, even a scintilla of evidence would prevail given Plaintiff's failure to submit anything. *See Chamlee v. Jonesboro Nursing & Rehab. Ctr., LLC*, 2019 WL 6042273, at *1 (M.D. Ga. Aug. 14, 2019) ("a party resisting arbitration [must] substantiate the denial of the contract with enough evidence to make the denial colorable" (quoting *Magnolia Cap. Advisors, Inc. v. Bear Stearns & Co.*, 272 F. App'x 782, 785 (11th Cir. 2008)); *Honig v. Comcast of Georgia I, LLC*, 537 F. Supp. 2d 1277, 1283 (N.D. Ga. 2008) (compelling arbitration where plaintiff "denies that she agreed to arbitrate her claims" but "offers no evidence to substantiate this denial,"

leaving defendant's "sworn declaration" "uncontroverted"); *Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.*, 663 F.2d 4, 7 (2d Cir. 1981) ("To make a genuine issue entitling the plaintiff to a trial [under 9 U.S.C. § 4], an *unequivocal* denial that the agreement had been made was needed, *and* some evidence should have been produced to substantiate the denial." (emphasis added)).

In any event, *Bazemore* does not say anything of the sort. The dispute there was whether the plaintiff "accepted" governing "terms" containing an arbitration clause when applying for a credit card online. But the defendant submitted "***no evidence*** of such an electronic exchange"—that is, "no evidence that the Internet web page or pages that [the plaintiff] viewed, or upon which she applied for her Imagine MasterCard, displayed or referred to any terms or conditions of the credit card she sought, much less that she was required to consent to any such terms in order to obtain her credit card." 827 F.3d at 1327-28 (emphasis added). All the defendant mustered was a declaration that an unspecified "form" of a cardholder agreement with "unknown terms," "of which it concededly has no copy," would later have been sent to the plaintiff. *Id.* at 1333. ***That*** is a mere scintilla of evidence. Here, AJC's detailed account of Plaintiff's actual screen flow and the corresponding contractual terms is precisely what the *Bazemore* defendant failed to provide.

At bottom, Plaintiff has offered no ground for avoiding enforcement of the mandatory arbitration clause to which he agreed when subscribing.

### B. <u>The Registration Status Of AJC's Mandatory Arbitration Provision Does Not Alter Its Enforceability</u>

Unable to rebut AJC's proof of contract formation, Plaintiff resorts to a misguided argument about the registration status of AJC's mandatory arbitration clause with the AAA. Plaintiff asserts that AJC has not yet "registered its arbitration clause with the AAA." Opp. 11. On that basis alone, Plaintiff contends that AJC "has failed to secure the AAA's agreement to accept jurisdiction" such that it "has waived its right to compel arbitration with the AAA" in court. Opp. 10. That argument defies governing AAA rules and contradicts the very cases Plaintiff cites for support.

To begin with, AJC has not failed to secure the AAA's agreement to accept jurisdiction or waived its right to do so. Rule 12 of the AAA's Consumer Arbitration Rules and Mediation Procedures[1] says that a business providing for arbitration under AAA rules "***should*** register its consumer arbitration clause with the publicly accessible AAA Consumer Clause Registry" by submitting the clause for "review." AAA Cons. Arb. R. 12(a)-(b) (emphasis added). Those provisions are not phrased in mandatory terms, and a neighboring provision explains why: "If a business does not submit its arbitration agreement for review prior to an arbitration being filed under that clause, the AAA ***will*** conduct an expedited review for the specific arbitration case," charging "a one-time, nonrefundable expedited review fee" for its effort. *Id.*

[1] *See* https://www.adr.org/media/yawntdvs/2025_consumer_arbitration_rules.pdf at 13.

R. 12(f) (emphasis added). That means when a party requests arbitration, the fact that the underlying clause has not yet been reviewed and registered ***is not*** a ground for declining to conduct arbitration; it merely mandates expedited review. Declining to register an arbitration clause, then, is entirely consistent with pursuing arbitration and nothing like the "intentional relinquishment or abandonment of a known right" required for waiver. *McClure v. AT&T Inc.*, 2024 WL 6082005, at *5 (N.D. Ga. Sept. 4, 2024) (quoting *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022)). The AAA's rules threaten rejection of an arbitration request only "if the business ***declines to pay the fees***," including the fee for expedited review. AAA Cons. Arb. R. 12(f) (emphasis added).

Here, no party has filed an arbitration with the AAA. AJC has merely moved for an order from the Court compelling arbitration. When Plaintiff subsequently files an arbitration demand pursuant to this Court's order, the fact that AJC's arbitration clause has not yet been reviewed and registered will not preclude AAA jurisdiction—it will simply trigger AAA's obligation to "conduct an expedited review for the specific arbitration case," with AJC paying the associated fee. *Id.*; *see, e.g.*, *Immediato v. Postmates, Inc.*, 2021 WL 828381, at *4 n.6 (D. Mass. Mar. 4, 2021) (compelling arbitration despite prior nonpayment of AAA fees and noting correspondence from AAA that it would "abide by any court order compelling arbitration"). Plaintiff's unfounded speculation that AAA "will not accept this case

because [AJC] has not properly registered the agreement," Opp. 13, is flatly contradicted by Rule 12 and provides no basis to decline to compel arbitration.

Plaintiff simply highlights this problem by relying on *Merritt Island* and *Bedgood*. Opp. 10. Both of those decisions affirmed the denial of a defendant's motion to compel ***after*** the AAA had ***already declined*** to conduct an arbitration because of case-specific procedural problems. The *Merritt Island* plaintiff previously "filed an arbitration demand with the AAA." 137 F.4th at 1271. The AAA "responded in a letter … that it was declining 'to administer this claim and any other claims between Space Coast Credit Union and its consumers'" in light of procedural concerns, including nonpayment of fees. *Id.* Similarly, the *Bedgood* plaintiffs previously filed arbitration demands that the AAA "dismissed … on the ground that [the defendant] had 'failed to comply with the AAA's policies.'" 88 F.4th at 1359. In both cases, the AAA expressly instructed the parties to "submit [the] dispute to the appropriate court for resolution." *Merritt Island*, 137 F.4th at 1271; *Bedgood*, 88 F.4th at 1359.

This case is entirely different: The AAA has not declined arbitration or instructed the parties to pursue litigation in court, and the plain text of Rule 12 makes clear that AJC will have the opportunity to pay for expedited review and then have AAA conduct an arbitration. Indeed, another portion of *Bedgood* squarely rejected the type of argument Plaintiff makes here. That case involved several motions to

compel, and one of them involved parties, an arbitration clause, and a dispute that had ***not*** previously been subject to an AAA rejection letter, as those particular parties had never "sought to arbitrate before filing suit in federal court." 88 F.4th at 1369. The district court declined to compel arbitration because it speculated that "the AAA would reject" any corresponding "petition." *Id.* That speculation was far more grounded than Plaintiff's conjecture here, since the parties at issue were related to those the AAA had previously turned away. *Id.* Even so, the Eleventh Circuit ruled it was improper to decline to compel arbitration based on such speculation. It emphasized that "there is no definitive indication in the record that the AAA actually determined that" the parties at issue "had violated AAA policies." *Id.* And without such an "evidentiary basis—in the form, say, of an actual rejection letter," courts may not assume that the AAA would decline arbitration. *Id.* Plaintiff asks this Court to make a far more tenuous assumption. *Bedgood* confirms it would be reversible error.

### C. Plaintiff's Claims Are Subject To AJC's Mandatory Arbitration Provision And The Court Should Stay This Litigation

Plaintiff does not dispute, and so concedes, that his claims fall within the scope of AJC's mandatory arbitration provision. Mot. 15-17. Plaintiff also does not dispute, and so concedes, that if the Court compels arbitration, it must stay this litigation pursuant to 9 U.S.C. § 3. Mot. 17.

## III. CONCLUSION

The Court should compel arbitration of Plaintiff's claims and stay this case.

Dated: July 7, 2026

Respectfully submitted,

WATSTEIN TEREPKA LLP

*/s/ Ryan D. Watstein*
Ryan D. Watstein
ryan@wtlaw.com
Georgia Bar No. 266019
75 14th Street NE, Suite 2600
Atlanta, Georgia 30309
Telephone: 404-782-0695

Aravind Swaminathan (admitted *pro hac vice*)
aswaminathan@orrick.com
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
401 Union Street, Suite 3300
Seattle, Washington 98101
Telephone: 206-839-4300

Ali Abugheida (admitted *pro hac vice*)
aabugheida@orrick.com
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
405 Howard Street
San Francisco, California 94105
Telephone: 415-773-5700

*Attorneys for Defendant*
*Cox Enterprises, Inc. d/b/a the Atlanta Journal-Constitution*

**CERTIFICATE OF COUNSEL**

I hereby certify that the foregoing document has been prepared with Times New Roman, 14-point font, one of the font and point selections approved by the Court.

*/s/ Ryan D. Watstein*
Ryan D. Watstein

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2026, all counsel of record, who are deemed to have consented to electronic service, are being served with a copy of this document via the Court's CM/ECF system.

*/s/ Ryan D. Watstein*
Ryan D. Watstein